IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| BILLY GENE CUNNINGHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:08CV417-SRW |
| | ) | (WO) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF OPINION**

Plaintiff Billy Gene Cunningham brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be reversed and this action remanded to the Commissioner for further proceedings.

**BACKGROUND**

On March 28, 2005, plaintiff filed an application for disability insurance benefits. On June 19, 2007, after the claim was denied at the initial administrative levels, an ALJ conducted an administrative hearing. The ALJ rendered a decision on December 27, 2007. The ALJ concluded that plaintiff suffered from the severe impairments of coronary artery disease and hypertension. (R. 14). He found that plaintiff's impairments, considered in

combination, did not meet or equal the severity of any of the impairments in the "listings" and, further, that plaintiff retained the residual functional capacity to perform his past relevant work as a "bait shop owner/operator" as plaintiff actually performed that work. (R. 26-27). Thus, the ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security Act from his alleged onset date through June 30, 2007, his date last insured. On April 18, 2008, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ became the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

The plaintiff challenges the Commissioner's decision, arguing that: (1) the ALJ erred in concluding that plaintiff can perform the physical demands of his past relevant work; (2) the ALJ's determination that plaintiff has the residual functional capacity to perform the full range of medium work is not supported by substantial evidence "[b]ecause Mr. Cunningham's GXT [graded exercise test] precludes him from performing the full range of medium work" (Plaintiff's brief, pp. 9-10); (3) the ALJ erred by failing to obtain the opinion of a vocational expert; and (4) the ALJ erred when he failed to find that plaintiff is disabled pursuant to Rule 203.01 of the Medical-Vocational Guidelines ("the grids").

Plaintiff has been under the care of a cardiologist since January 2005, when he was hospitalized for a five day period following an acute myocardial infarction. He was admitted to Southeast Alabama Medical Center on January 16, 2005 and was treated with medications. After a cardiac catheterization, he was transferred to UAB Medical Center, where he had another catheterization with a coronary angiogram and stent placement. He was discharged home on January 21, 2005 with medications and instructions to follow-up with his cardiologist in six weeks. On February 8, 2005, plaintiff's primary care physician, Dr. Cook, noted that plaintiff "feels weak," but that he "is improving" and "is having no major complaints at this time." Dr. Cook wrote, "He wants to be on disability but I have explained to him that he probably does not qualify for total disability." Four weeks after his surgery, plaintiff's cardiologist, Dr. Centafont, released plaintiff to return to work with a limitation to performing only supervisory duties for a period of four weeks.

On February 24, 2005, plaintiff sought treatment at the emergency room when he was "unnerved" by "brief and fleeting transient and self terminating palpitations" in his throat and right side of his chest. He was placed on a monitor and was released after the monitor showed only sinus rhythm. The ER physician instructed him to follow up with his cardiologist for evaluation with a Holter monitor. Plaintiff was admitted to Southeast Alabama Medical Center on March 11, 2005, after he again went to the emergency room complaining of "a one-week history of palpitations and fluttering, starting when he was about to go riding his horses after he ate and since then has been occurring after he eats breakfast or taking lunch." He reported that the palpitations lasted for ten to fifteen minutes. He denied any episodes with exertion and had no other cardiovascular symptoms. Plaintiff was placed on a beta blocker to treat his ventricular bigeminy and was discharged on March 14, 2005 with instructions to follow-up as an outpatient if he sensed a change in his rhythm.

On March 31, 2005, plaintiff went to Dr. Centafont for follow-up. Examination revealed no abnormal findings, and plaintiff was "angina free." Dr. Centafont scheduled him to follow up in three months for a Cardiolite stress test. On May 25, 2005, plaintiff returned for follow-up. He refused use of the Cardiolite agent, despite a long discussion with Dr. Centafont about it. Although Dr. Centafont believed plaintiff's fears to be irrational, he performed only the Bruce protocol stress test instead of the Cardiolite stress test. Dr. Centafont wrote, "The patient exercises today by Bruce protocol for 8 minutes to a heart rate of 142 bpm or 87% of the maximally predicted heart rate. Double product 24,120. The study was clinically and electrically negative for induced ischemia." Dr. Centafont noted that plaintiff "seems to be doing well overall." He instructed plaintiff to have a fasting lipid

profile in follow-up with his family physician and to do so every six months, and to follow up with Dr. Centafont annually. On August 11, 2005, plaintiff returned to Dr. Centafont and obtained samples of Crestor. His blood pressure was "under good control" and he "remain[ed] angina free." He told Dr. Centafont that "he had a recent fall from his barn resulting in right biceps detachment and subsequent surgery[,]" and that he "had no problems with the reattachment procedure." Dr. Centafont concluded that plaintiff was "doing well" and scheduled him to follow up in six months. (Exhibits 1F, 2F, 3F, 4F, 5F, 6F, 15F).

Plaintiff sought treatment in the ER on October 25, 2005 with complaints of a "sore" chest, with the pain worsened by deep breathing and with symptoms of fever and cough. He was released in improved condition. (R. 310-18). Plaintiff returned to Dr. Centafont on February 23, 2006. His blood pressure remained "under good control." He asked to discontinue his Plavix medication and Dr. Centafont indicated that plaintiff's stent placement was over a year previously and he had "no trouble" with plaintiff coming off of that medication. He advised plaintiff to have a fasting lipid profile drawn and to return in approximately six months. (R. 345). On August 4, 2006, plaintiff reported to the emergency room "after noticing several episodes [that] week of increasing shortness of breath in the context of financial concerns. He further reported an episode of shortness of breath following sexual intercourse. Plaintiff did not want to be hospitalized due to his financial situation and wanted to be treated medically. The doctor gave him a Nitroglycerin patch and discharged him, stating that it was reasonable to discharge him "given the brevity of his symptoms and no recurrences." The ER doctor advised plaintiff to follow up with Dr. Centafont as

scheduled in the next two to three weeks. (R. 299-309).

When plaintiff returned to Dr. Centafont on August 30, 2006, he denied angina, and his blood pressure remained under good control. After reviewing the report from plaintiff's earlier visit to the ER, however, Dr. Centafont scheduled plaintiff for a stress test. (R. 344). In December 2006, plaintiff's primary care physician treated plaintiff for complaints of congestion and sore throat. He noted that plaintiff had "miss[ed] a follow up with Dr. Centafont with stress testing" and recommended that plaintiff follow up on that. (R. 327). Five months later, plaintiff had a Cardiolite stress test which was abnormal, with evidence of inducible ischemia. (R. 342). Dr. Centafont recommended a heart catheterization (R. 339), which he performed on June 21, 2007. (R. 336-37). Dr. Centafont concluded that plaintiff's "[l]eft main disease [was] not critical at this time but certainly significant." However, he did not feel that coronary bypass surgery was warranted based on the angiograms. He recommended "intense lipid lowering therapy," including therapy with aspirin and plaintiff's other medications. (Id.). When plaintiff returned to Dr. Centafont for follow-up a month later, he reported that he had "been doing quite well without chest pain. He denied shortness of breath, dyspnea on exertion, paroxysmal nocturnal dyspnea, or orthopnea. Dr. Centafont's diagnostic impressions included "[c]oronary artery disease currently asymptomatic[,]" "[h]ypertension well controlled[,]" and "[d]yslipidemia." (R. 361). At plaintiff's next six-month follow-up on January 16, 2008, Dr. Centafont noted, "He has been doing quite well since his last visit. He denies chest pain, shortness of breath, or dyspnea on exertion. He denies PND or orthopnea. He denies syncope or near syncope. He states he is compliant

with his current medications. He does not smoke and enjoys an excellent functional status."

(R. 362).[1]

## Residual Functional Capacity

Plaintiff argues that the ALJ erred in concluding that plaintiff retains the residual functional capacity to perform medium work. The ALJ concluded that:

> through the date last insured, the claimant retained the residual functional capacity to perform the full range of medium work. The claimant could stand for periods of two hours and for at least six hours total in an entire eight-hour workday; he could walk at least six hours total in an entire eight-hour workday; he could sit at least two hours total in an entire eight-hour workday; he could use his upper and lower extremities without limit; he had no postural limitations, no communicative limitations, and no visual limitations. The claimant was restricted from constant exposure to temperature extremes and, because of occasional syncopal episodes he was restricted from activities at unprotected heights and open water. The claimant's residual functional capacity is not further reduced by any other exertional or nonexertional limitations.

(R. 18).

Plaintiff's argument that the ALJ erred in assessing his residual functional capacity is based entirely on his contention that the May 25, 2005 graded exercise test "proves he would have significant difficulty trying to perform medium work." (R. 10). He argues that, "[b]ecause [his] GXT precludes him from performing the full range of medium work, the

---

[1] The ALJ found that, although plaintiff was diagnosed in a consultative examination with borderline intellectual functioning and has been treated for anxiety, plaintiff's mental impairments are not "severe." (R. 15-16). The ALJ further concluded that other physical impairments (including vertigo, upper respiratory infections, bronchitis, obesity and a surgically repaired injury to plaintiff's triceps) were not "severe" and, with regard to plaintiff's report of chronic back pain, there is no evidence of a medically determinable underlying impairment which could reasonably be expected to produce functional limitations. (R. 15-17). Upon review of the entire record, the court concludes that ALJ's determinations on the severity of these impairments are supported by substantial evidence. Since plaintiff does not challenge these findings, the court does not discuss the evidence pertaining to these impairments.

ALJ erred as a matter of law in assessing [plaintiff's] residual functional capacity." (Id.).[2]

Plaintiff notes that, during his graded exercise test using the Bruce protocol, he was only able to exercise for a total of eight minutes. (See R. 226). In support of his argument, he cites David A. Morton, III, M.D., *Social Security Disability Medical Tests*, § 4.51, 4-113 - 4-115 (1st ed. 2003). (Plaintiff's brief, pp. 8-9). He quotes Dr. Morton's conclusions that "[a]bout 5 METS are required to do very light work[,]" "[p]eople who do not exercise regularly and lead a very sedentary lifestyle often cannot do more than about 7 METS on an exercise test[,]" and "[h]ealthy people who get regular exercise can reach higher MET levels." (Id., p. 9). He then argues that his eight-minute stint on the treadmill equates to "7-8 METS [metabolic equivalents]," and this "proves he would have significant difficulty trying to perform medium work[.]" (Id., pp. 9-10; see also Plaintiff's reply brief at pp. 4-5). The Commissioner disagrees with plaintiff's interpretation of the Morton treatise, maintaining that "[n]othing in the treatise indicates that a claimant like Plaintiff, who had a score of approximately eight METS, would be unable to perform medium work." (Commissioner's brief, p. 14).

The court need not decide whether Dr. Morton's treatise supports or contradicts the ALJ's conclusion that plaintiff has the residual functional capacity to perform medium work. Although Dr. Centafont has not expressed any opinion on plaintiff's specific exertional

---

[2] The court does not read plaintiff's brief to include an argument – as characterized in the Commissioner's response – that the ALJ's conclusion that plaintiff can perform the full range of medium work "is at odds" with his step two finding that plaintiff's coronary artery disease and hypertension are "severe" impairments. (See Commissioner's brief, pp. 13-14; Plaintiff's brief, p. 8). Plaintiff contends that his severe heart impairments would preclude him from doing the full range of medium work, "[b]ased on the relevant medical evidence[,]" specifically, the May 2005 GXT. (Plaintiff's brief, pp. 7-10).

8

limitations, his treatment note following the stress test indicated that plaintiff "seem[ed] to be doing well overall." (R. 226). Additionally, in evaluating plaintiff's RFC, the ALJ relied on and gave significant weight to the opinion of the state agency medical consultant, Dr. Crump, who assessed plaintiff's limitations to be consistent with medium work, with environmental limitations to avoid concentrated exposure to extreme cold and heat. (R. 25; Exhibit 8F, R. 239-46). Dr. Crump reviewed the results of plaintiff's May 2005 graded exercise test in rendering his opinion about plaintiff's physical residual functional capacity. He twice expressly noted the specific result (R. 241, 244), concluding:

> [Plaintiff] does have some problems with a heart condition. At this time the claimant is taking Plavix for his impairment. The claimant does have some shortness of breath. His current BP is 124/80 within normal limits. The claimant also has RRR. His neuro is intact. The claimant also has a heart rate of 142 bpm or 87% of the maximally predicted heart rate. His double product is 24,140. There is a negative clinically and electrically for induced ischemia. At this time the claimant is doing well however there is evidence of some functional limitations which is noted on this medium RFC.

(R. 244). The ALJ was required to consider Dr. Crump's expert medical opinion (see SSR 96-6p), including his opinion that the results of the graded exercise test did not preclude medium work. Because Dr. Crump's assessment did not conflict with any opinion by an examining or treating medical source and was consistent with the record as a whole, the ALJ did not err by relying on it. See 20 C.F.R. § 404.1527[3]; see also SSR 82-51, "Guidelines for

---

[3] In addition to Dr. Crump's opinion, the ALJ discussed and relied on the other medical evidence of record, including the evidence that: Dr. Centafont released plaintiff to work, limited to supervisory duty for only four weeks, a month after his surgery at UAB (R. 25, 228); Dr. Cook advised plaintiff in February 2005 that he "probably does not qualify for total disability (R. 26, 185); that no treating source expressed an opinion that plaintiff was precluded from his past work (R. 17); and plaintiff's reported activities of riding his horses, handling bales of hay, climbing into a barn hayloft, driving his truck, attending to household chores, attending to his personal needs without assistance, shopping, entertaining friends, and caring for his

Residual Functional Capacity Assessment in ... Cardiovascular Impairments" (contradicts plaintiff's argument that test result of 7-8 METS definitively rules out medium work; indicating that for ischemic heart disease with angina, treadmill exercise test "negative" at 7 METs, but "positive" at 10 METs or less, "[h]eavy work activity would be precluded, but ability to engage in medium work activity ordinarily would be retained unless restricted by other cardiac impairments such as congestive heart failure" and that for postmyocardial infarction or coronary artery bypass graft, without angina, congestive heart failure, or significant arrhythmias, "heavy work activity would be precluded unless specific exercise testing establishes the ability to engage in heavy work activity. The distinction between the capacity to perform medium and light work activity requires consideration of the medical evidence describing the individual's clinical condition"). Accordingly – even assuming that Dr. Morton's treatise unambiguously states that any person with a graded exercise test result of 7-8 METS cannot perform medium work – the ALJ's RFC determination was, nevertheless, supported by substantial evidence of record. Cf. Belle v. Barnhart, 129 Fed. Appx. 558, 559 (11th Cir. 2005)(finding ALJ's credibility determination to be supported by substantial evidence, despite plaintiff's citation to medical treatises indicating that impairments of diabetes and hypertension – the plaintiff's severe impairments – "can be expected to produce pain and motor weakness, dizziness and fatigue.").

## The Requirements of Plaintiff's Past Relevant Work

A claimant who retains the residual functional capacity to perform his past relevant

---

pets and other animals.  (R. 19, 26; Exhibits 5E, 13F).

10

work – either as he actually performed that work or as it is generally performed in the national economy – is not disabled. 20 C.F.R. § 404.1520(f), § 404.1560(b); SSR 82-61. In this case, the ALJ concluded that plaintiff was able to perform his past work "as it was actually performed." (R. 27). Plaintiff argues that the ALJ's conclusion that plaintiff can perform his past relevant work is flawed because the ALJ failed to develop the record further regarding the physical requirements of plaintiff's past relevant work. He contends that the only evidence of record regarding the exertional requirements of the "laborer" aspect of plaintiff's job was his own description of his job requirements, which included exertional requirements outside the range established for medium work. (Plaintiff's brief, pp. 5-6).

As the Commissioner points out, the plaintiff bears the burden of establishing that he cannot perform his past relevant work. However, the ALJ has an obligation to develop the record regarding the requirements of plaintiff's past relevant work. <u>Schnorr v. Bowen</u>, 816 F.2d 578, 581 (11th Cir. 1987). In this case, the plaintiff offered evidence of the requirements and duties of his past relevant work as he actually performed it, in both his work history report (Exhibit 3E, R. 122-28) and his testimony at the hearing (<u>see</u> R. 373-74). The ALJ rejected the plaintiff's statements regarding the requirements of his job, which he is entitled to do. However, to support his conclusion that plaintiff's RFC does not preclude his past relevant work, the ALJ is required to compare plaintiff's RFC with the demands of his past relevant work. In order to make this comparison, the ALJ must have substantial evidence regarding the demands of plaintiff's past relevant work. See <u>Lucas v. Sullivan</u>, 918 F.2d 1567, 1574 n. 3 (11th Cir.1990)(" To support a conclusion that [a claimant] is able to return

to [his] past work, the ALJ must consider all the duties of that work and evaluate [his] ability to perform them in spite of [his] impairments.")(citations omitted); see also SSR 82-62 ("The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision. Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit.").

In plaintiff's work history report, he indicated that he worked thirteen hours per day, seven days per week at his job as a "Bait & Tackle Operator." (R. 122). He stated that he was required to walk and stand for eight hours each day; sit for five hours; climb for four hours; stoop, kneel, crouch, crawl or reach for six hours; handle, grab or grasp big items for four hours; and write, type or handle small objects for four hours. He lifted and carried bags of feed, frequently lifting 40-75 pounds. The heaviest weight he lifted was 100-150 pounds. Plaintiff indicated that he supervised 2-10 people, and spent fifty percent of his time supervising people. (R. 122-23).

In a February 18, 2005 treatment note, Dr. Centafont wrote:

> [Plaintiff] is very anxious to go back to work. He states he is in a very competitive field. He is worried that he is going to [lose] accounts if he does not get back to work. He has lots of helpers who do all the hard work. At this time, I think he can go back and supervise.

(R. 228). Dr. Centafont concluded, "We will have him go back to work *on a limited basis as described above. He will have a supervisory role for the next four weeks*." (Id.)(emphasis added). In rejecting plaintiff's statements indicating that the exertional demands of his past

work exceeded those of "medium" work (see 20 C.F.R. § 404.1567), the ALJ reasoned that "this is inconsistent with the information [plaintiff] provided to his physician regarding the 'heavy work.'" (R. 26). The ALJ stated, "According to what the claimant told his physician in February 2005 regarding returning to work, the claimant was not required to do 'heavy work' because he had 'lots of helpers.' (R. 27). Despite the ALJ's use of quotation marks, the plaintiff did not actually use the term "heavy work" – as the ALJ earlier correctly noted, the plaintiff told Dr. Centafont that he "has lots of helpers who do all the *hard* work." (R. 26)(emphasis added). Plaintiff's report to his doctor that his helpers did "all the hard work" does not directly translate to "heavy" work – at least, not as that term is defined in the Commissioner's regulations – and the ALJ did not ask the plaintiff what he meant by "hard work." While this might otherwise be a minor distinction, the ALJ's conclusion that the plaintiff's RFC limitation to medium work does not preclude his past relevant work rests almost entirely on this single statement in Dr. Centafont's treatment note. The ALJ reasoned:

> In comparing the residual functional capacity the claimant had as of the date last insured with the physical and mental demands of this work, the undersigned finds that the claimant was able to perform it as it was actually performed. The claimant reported to his physician that he had workers who performed the heavier work and that his job was more of a supervisory position than that of a laborer.

(R. 27). The ALJ appears to acknowledge in this statement that plaintiff's work required at least some work as a laborer. This would be consistent with Dr. Centafont's treatment note, which cannot fairly be read to mean that plaintiff performs exclusively supervisory duties. At the administrative hearing, in response to questions from the ALJ, the plaintiff testified as follows:

13

> Q.  [I]n . . . one of the questionnaires, you indicated that sometimes you supervised from two to 20 people.  Were you a working supervisor when you did that?
>
> A.  That was when I had my bait company going, you know.
>
> Q.  Did you just supervise or did you do the work yourself?
>
> A.  Oh, they was working for me.  In other words, they was like seasonal workers, you know.  When I'd need some like diggers to dig bait, you know, they would dig for me.  Yes, sir.  And I would have to – well, I told them what I wanted them to do.  Yes, sir.  I guess that would be what you would call supervising.  Wouldn't it?
>
> Q.  Well, that was – was that a – just during the time that you were busy, or –
>
> A.  Yes, sir.  You know, it's seasonal work, you know, like – say like from March, April, May, June, about four to six, maybe seven months out of hte year.  It was according to the weather, Judge.
>
> Q.  Well, for any period of time, did you do nothing but supervise?
>
> A.  Well, I had to – I went – I worked just whatever come to hand which would consist of – from packing the bait to raising them.  In other words, I'd go out there and I'd raise them.  It'd consist of manual labor to managing I guess what you'd call, just general –
>
> Q.  Yeah.  That's what I was getting at.  You were a working supervisor is what I asked you.  Is that correct?
>
> A.  I guess.  Yes, sir.

(R. 373-74).  Thus, the testimony before the ALJ clearly indicated that plaintiff performed some "manual labor" in addition to supervising.

Dr. Centafont's treatment note does not suggest that plaintiff's work – as he performed the "laborer" portion of it, from which Dr. Centafont restricted him for a period of four weeks – never required lifting over fifty pounds.  See 20 C.F.R.

§ 404.1567(c)(medium work "involves lifting no more than 50 pounds at a time[.]"). As noted previously, plaintiff's description of the demands of his job in work history report indicates that the work was well above the medium exertional level. In discounting plaintiff's account of the lifting requirement of his work, the ALJ wrote: "This is . . . inconsistent with the claimant's testimony indicating that subsequent to the death of his brother/partner, he was required to lift weights of *approximately 50-pounds*." (R. 26)(emphasis added). Plaintiff did not testify that his brother was his partner, nor did he testify that, after his brother's death, he had to lift "approximately 50 pounds." Instead, plaintiff stated that his brother had a bait farm, that plaintiff worked for him briefly at that farm, that he that he did not perform the same work for his brother as he did when he ran the bait shop, and that he lifted bags of feed weighing "anywhere from 50 to a hundred pounds." (R. 371). He testified as follows:

> Q. How long did you work with your brother before you went to the bait shop and what did you do?
>
> A. Nothing, just – in other words, he had a bait farm there and I worked a little bit with him. And he passed away.
>
> Q. Okay. And then you took over the operation?
>
> A. No, sir. No, sir.
>
> Q. Okay. You did not?
>
> A. No, sir.
>
> Q. But it was on the bait farm that you worked for your brother?
>
> A. Yes, sir. I worked –
>
> Q. And what kind of work did you do there?

15

>    A.  I just done –
>
>    Q.  *Was that the same as the work you were doing when you took over the shop?*
>
>    A.  *No, sir.*  It was just odd and end things, just line peanut holes and stuff like that [INAUDIBLE] peanut holes and feeding the worm bed and stuff like that.
>
>    Q.  *How much did you have to lift when you were working for him?*
>
>    A.  Oh, them bags of feed would weigh *anywhere from 50 to a hundred pounds.*

(R. 371-72)(emphasis added).  This testimony does not provide substantial evidentiary support for the ALJ's apparent conclusion that, as plaintiff actually performed it, his work as a "bait shop owner/operator" did not require lifting more than fifty pounds.  See R. 26.  Additionally, even if it did, there is no evidence of record to contradict plaintiff's statement that he worked thirteen hours per day, seven days per week.  (R. 122).

The ALJ did not consider any evidence regarding the requirements of the job as it is generally performed in the national economy and did not reach the question of whether plaintiff could perform his past relevant work as it is generally performed.[4]  Thus, his step four determination that, through the date last insured, plaintiff's "past relevant work as bait shop owner/operator did not require the performance of work-related activities precluded by

---

[4] During initial administrative processing of this case, the disability claims examiner completed a "vocational rationale form" indicating that plaintiff's limitations as set forth in Dr. Crump's physical RFC assessment are consistent with plaintiff's past relevant work "as the job is usually performed in the national economy."  (R. 136).  The court notes that the DOT provision cited by the claims examiner does not describe plaintiff's work.  See DOT # 442.684-010 (describing the duties of a Line Fisher, including catching fish and other marine life with hooks and lines, laying out lines, and attaching hooks, bait sinkers, anchors, floats and swivels).  It appears that plaintiff's past relevant work is, instead, encompassed within the DOT's description of the duties of a Worm Grower (alternatively, Fish-Worm Grower).  See DOT # 413.161-018.

the claimant's established residual functional capacity" is not supported by substantial evidence. (R. 26).[5]

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is due to be reversed, and this action remanded to the Commissioner for further proceedings. On remand, the Commissioner need not take additional testimony on the issue of the demands of plaintiff's past relevant work as he actually performed it, if the Commissioner chooses to proceed to the question of whether plaintiff was able, as of his date last insured, to perform his past relevant work as it is generally performed in the national economy.[6]

Done, this 14th day of June, 2010.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

---

[5] The court does not reach plaintiff's remaining arguments, which are pertinent only in the context of a Step 5 decision.

[6] While the court may take judicial notice of the content of a DOT provision where the ALJ has relied on it to support his step four determination (see Hubbard v. Commissioner of Social Security, 348 Fed. Appx. 551, 553 (11th Cir. 2009)), it "may not supply a reasoned basis for [an] agency's action that the agency itself has not given." Dixon v. Astrue, 312 Fed. Appx. 226, 229 (11th Cir. 2009). In this case, the ALJ did not cite any applicable DOT provision and did not reach the issue of whether plaintiff's RFC precluded his past relevant work as it is generally performed in the national economy.